THE STATE OF OHIO, APPELLEE, *v.* HUFFMAN, APPELLANT.

[Cite as State v. Huffman, 20 Ohio App. 2d 263.]

264

(No. 731—Decided December 3, 1969.)

*Mr. Richard J. Rinebolt,* prosecuting attorney, for appellee.

*Mr. Russell E. Rakestraw,* for appellant.

*Per Curiam.* This is an appeal from an order of conviction and sentence for violation of a township zoning ordinance. At the outset we are presented with the question as to whether the bill of exceptions may be used to demonstrate error, or whether it was belatedly filed and may not be so used. This was a case before the Municipal Court of Fostoria, and the bill of exceptions was received by the trial judge, according to his notations, on April 8, 1969, approved and returned to the clerk the same day. The judgment entry overruling the motion for a new trial was dated and filed with the clerk March 25, 1969. Therefore, fourteen days expired between the entry and the presentation of the bill of exceptions to the trial judge, which is more than the ten days prescribed for County Courts and less than the thirty days prescribed for Common Pleas Courts. We thus have the question: Which time limit applies to Municipal Courts? The statutes are not clear, and analysis is necessary.

Originally there was no specific mention of bills of exceptions in the Municipal Court Act. Under this form of the statutes it was held in *State* v. *DeCamillo* (Common Pleas of Ashtabula County, 1961), 86 Ohio Law Abs. 429, that the time limit prescribed by Section 2945.65, Revised Code, for Common Pleas Courts applied, which is thirty days. That same year, effective October 19, 1961, the Legislature amended Section 1901.21, Revised Code, in an effort to eliminate conflicts as to procedure in lower courts

and added the words "and of filing bills of exceptions" to the processes which in Municipal Courts would be the same as in County Courts. There was thus a specific reference making Section 1913.32, Revised Code, the governing section, and it provided:

" * * *Such party has ten days from the date of overruling the motion for new trial * * * to reduce his exceptions to writing and present them to such County Court judge, mayor, or police judge."

Skeel in his Ohio Criminal Manual, 1967 Supplement, said:

"By this amendment all doubt about this question is resolved and Revised Code 1913.32 is clearly applicable." (p. 29.)

The ten-day limitation was thus established and would apply in the instant case had not the Legislature made further amendments to the Municipal Court Act in 1965. By Amended House Bill 231 (131 Ohio Laws 606), Section 1901.30 was amended to add the italicized language:

"Appeals from the Municipal Court may be taken as follows:

"(a) Such appeals may be taken either to the Court of Common Pleas or to the Court of Appeals in accordance with Sections 2505.01 to 2505.39, inclusive, *2945.65 to 2945.70, inclusive,* and 2953.02 to 2953.14, inclusive, of the Revised Code." (Emphasis added.)

Sections 2945.65 to 2945.70, Revised Code, deal explicitly with the filing of bills of exceptions in criminal cases, and in Section 2945.65 it is provided:

" * * * The court shall fix the time within which such bill of exceptions or objections shall be filed, * * * not more than thirty days from the overruling of the motion for a new trial * * * ."

Thus, the question is directly presented as to whether the Legislature has repealed by implication the prior change in Section 1901.21. Revised Code, and made the thirty-day time limit of Common Pleas Court procedure applicable to Municipal Courts. In *Cleveland* v. *Gunn* (1966), 8 Ohio App. 2d 301, Judge Skeel concluded that

there was no such repeal, and the conflict between the two sections is resolved by the statement:

" * * * Section 1901.30, Revised Code, is general in nature while Section 1901.21, Revised Code, is specific. It is for that reason that Section 1901.21, Revised Code, provides the rule for filing bills of exceptions in criminal cases in Municipal Court. * * *"

The statement however is *dicta,* since the notice of appeal was not timely filed, the bill of exceptions was filed 32 days late in any event, and the proceeding was pending at the time of the amendment. On analysis of Amended House Bill 231 and its full impact, we do not agree with this conclusion. This legislation was apparently a package giving the solicitor the same rights as a prosecuting attorney in respect to bills of exception. On the one hand the procedure for a prosecuting attorney's appeal was made applicable to solicitors and the section pertaining to filing a bill of exceptions with leave of the Court of Appeals; on the other hand, on defendant's appeals he was given the right to notice of the filing of the bill of exceptions and time to file objections. The procedure was thus completely different from that provided for in County Courts. There the bill of exceptions was presented directly to the court which then, without notice to the solicitor or prosecuting attorney, had three days to make corrections and to transmit it to the clerk of the Common Pleas Court. In the procedure now made applicable to Municipal Courts, the bill of exceptions is not presented to the judge but is filed with the clerk who is under duty to notify forthwith the prosecuting attorney or solicitor, who then has 5 days to file objections. Then and only then does the clerk transmit the bill of exceptions to the trial judge. The basic intent of the amendment was obviously to give the solicitor in the Municipal Court the same right to notice and time to object that the prosecuting attorney had in the Common Pleas Court.

But to accomplish this, filing with the clerk (who must give the notice) was substituted for presenting the bill directly to the trial judge. There is no longer a presenting

of the bill of exceptions to the trial judge pursuant to Section 1913.32, Revised Code, and the time limit for so doing would be meaningless. On the other hand, there now is, by virtue of this amendment, a filing with the clerk to give the solicitor an opportunity to review and object and amend. The time limits of thirty days under Section 2945.-65, Revised Code, apply to the filing with the clerk and, hence, are applicable.

"If an act is so repugnant to, or so contradictory of, or so irreconcilably in conflict with, a prior act that the two cannot be harmonized in order to effect the purpose of their enactment, the later act operates, without any repealing clause, as a repeal of the first to the extent of the irreconcilable inconsistency." 37 Ohio Jurisprudence 395, Section 135, quoted in *Kinsey* v. *Commissioners of Akron Metropolitan Park Dist.* (1946), 147 Ohio St. 66.

Although repeals by implication are not favored in the law, and the presumption is against such repeal, we feel the repugnancy in this case is such as to overcome the presumption and effect repeal by implication.

1. The Legislature intended to deal specifically with procedure on bills of exceptions in Municipal Courts. It changed the "Common Pleas" Court to "trial court" to include Municipal Courts. It added the words "solicitor" to prosecutor—applicable only to the Municipal Court. It amended the Municipal Court section on appeals so as to bring these sections in by reference. The whole purpose of the act—to give the solicitor certain rights as to bills of exception—would be nullified if it were not so applied.

2. Necessary to effect this purpose, the bills of exceptions had to be filed 5 days prior to presentment to the judge to give the solicitor time to object or amend. If presentment to the judge was still operative in 10 days, this meant the clerk had the bill for five of the ten days, leaving only five days for preparation—a manifestly absurd result. Moreover it made it a duty of the clerk to transmit the bill to the trial judge—which made it impossible for the appellant to so present it.

3. It is, therefore, concluded that presentment to the

trial judge by the appellant required under Section 1913.-32, Revised Code, is totally inconsistent with the procedure required by the new act. Presentment directly to the judge is, therefore, eliminated, and filing with the clerk is substituted. But if this be the case, then the ten-day limitation on presentment to the judge must either be eliminated completely or leads to the absurd curtailment of time of preparation to five days, a result we are certain the Legislature would not intend to accomplish.

4. Therefore, the new statute is so contradictory, so irreconcilable with the old procedure and leads to such an absurd result, that it cannot be reasonably harmonized with it. We, therefore, conclude the Legislature intended to and did, by implication, repeal the reference in Section 1901.21, Revised Code, to bills of exceptions. The time limit of 30 days in Section 2945.65, Revised Code, then must govern the time for filing bills of exception with the clerk in Municipal Court. This being the case, the limit of thirty days is applicable, and the bill of exceptions in the present case was timely filed.

In his first assignment of error, appellant contends that a strict construction of the zoning ordinance reveals no prohibition against placing a mobile home on land in an A-1 or agricultural district. With this contention we do not agree. Article III states, ''Uses not listed or interpreted to be included categorically under this Article and Article XIII shall not be permitted except by amendment to the resolution.'' The use of A-1 land for mobile homes is not included in permitted uses but is included specifically under ''conditional uses requiring board approval.'' Under these circumstances we fail to see where any interpretation is necessary. True, other sections deal with mobile homes outside A-1 districts where such a use may be a nonconforming use or a temporary use. However, the prohibition of mobile homes on A-1 land under Article III is most explicit, and such a use is only permitted where board approval has been obtained. It is also true that the general exception of Section 5 (1), Article II, for a structure whose use is incident to an agricultural use applies to

all zones, including A-1 zones. However, the existence of the exception in no way nullifies the general use restriction of Article III.

In his second assignment of error appellant, defendant below, contends that

(a) The court erred in not determining as a matter of law that the mobile homes in question were structures whose use was incident to the use for agricultural purposes of the land on which they were located.

Briefly, the evidence established that one Breitigan wanted a place to put his mobile home and talked to the defendant about placing his trailer on defendant's farm and doing part-time farm work. An offer was made to pay rent, which was refused by the defendant, but permission was given in exchange for part-time help on the farm. Later, a second trailer belonging to a friend of Breitigan was placed on the farm, but he did no work, and no additional consideration was promised. Breitigan had a full-time regular job but did in fact help the defendant by repairing a barn, weeding, and driving farm machinery. It was also established that no permit or board approval for a conditional use was obtained.

It would appear that whether "structure use" was incident to "agricultural use" is essentially a question of fact for the trier of facts. "Incident" used as an adjective and in the sense here found means: "dependent on or appertaining to another thing: directly and immediately relating to or involved in something else though not an essential part of it" (definition of legal usage of the term given in Webster's Third New International Dictionary).

In 42 Corpus Juris Secundum 520 the term is defined as follows: "the term is used both substantively and adjectively of a thing which either usually or naturally and inseparably depends on, appertains to, or follows another which is more worthy. * * *"

We thus find that structure-use must be "directly and immediately" related to agricultural use. It must be either "usually or naturally and inseparably" dependent upon agricultural use. Now, we do not believe it can be said, as

a matter of fact, so invariant as to be a matter of law, that the use of mobile homes for use as dwelling by temporary, incidental, extra or occasional farm help is directly, usually, naturally or inseparably connected with the use of land for farming purposes. It is obviously not naturally so related. There is nothing in the nature of a physical law requiring this arrangement. It is not inseparably so connected. There are many farms where such an arrangement does not obtain. Whether it be a usual arrangement would be a question of fact dependent on evidence as to the custom and use in a particular community. Whether the connection is "direct and immediate" or indirect and secondary depends on the total situation as a matter of degree as involved. The use of a building as a dwelling is not per se a direct and immediate connection with the farming of adjacent land. Whether the incidental and occasional labor of those living in a dwelling is sufficient to connect the dwelling directly to a farming use is a question of fact dependent upon all the circumstances. We cannot say that, as a matter of law, the use here established was directly and immediately so related.

The question necessarily involves a determination as to whether the structure was primarily used as a dwelling and secondarily used as an abode for farm workers, or whether it was used primarily and directly to provide, for the landlord, easily-available farm labor. This was a question for the trier of the facts.

In this case both mobile homes were used as dwellings. Neither was provided by the defendant to entice farm labor or to make available living quarters for farm labor. Each belonged to the respective tenant who had been using it elsewhere as a dwelling totally unrelated, apparently, to farming activity. The sole nexus to agricultural use was the promise by Breitigan to work occasionally on the farm, a part-time activity and a relatively minor one from the description of what he actually did. It will be noted that this is not a case involving a tenant farmer. In this case, the farm proper was already rented to another. Nor is it a case of supplying housing for seasonal migrant labor.

Whether this arrangement was one for a situs for a dwelling with rent paid in occasional labor or one for farm labor induced by free rent of a place for a mobile home becomes a question of fact; and on this question of fact depends the nexus between the structure and the agricultural use. We cannot, on the record before us, hold as a matter of law that the use of the mobile homes was incident to the agricultural use of the land, or that the finding of the trial court, that it was not, was against the manifest weight of the evidence.

Appellant contends, also, (b) that the court erred in not holding that certain portions of the zoning ordinance were in conflict with the agricultural-use exemption discussed above as set forth in Section 519.21, Revised Code. However, Section 5 (1) of the zoning ordinance sets forth this specific exemption, and we fail to find any conflict exists.

The third assignment of error charges that in this particular case the zoning regulation bears no substantial relationship to public health, safety or morals, and hence exceeds the statutory grant of power to townships. The appellant argues that because trailers and mobile homes are improving there is no longer a need to regulate them. There are still, however, all sizes, ages, and varieties of such homes, and not all are of the improved variety. The issue as to whether such regulations are needed is a political one to be resolved by the legislative body—in this case, the township trustees. *Willott* v. *Beachwood,* 175 Ohio St. 557.

In *Willott* v. *Beachwood, supra,* the court says, "Even though the court, on the facts presented, might decide otherwise than did council, so long as the matter is reasonably debatable, the court has no authority to interfere. The power of a municipality to establish zones, to classify property, to control traffic and to determine land-use policy is a legislative function which will not be interfered with by the courts unless such power is exercised in such an arbitrary, confiscatory or unreasonable manner as to be in violation of constitutional guarantees."

Whether the regulation of mobile homes bears a substantial relationship to public health and safety is, in the first instance, legislative, and to so regulate in the manner here done is certainly reasonably debatable. It cannot be said to be unreasonable, confiscatory or arbitrary, particularly as here involved, for here no attempt has been made to obtain a permit for conditional use from the zoning board.

Assignment of error No. 4 deals with the issue as to whether the prosecution case negatived the exemptions in the ordinance or in the statutes, primarily the agricultural exemption and the conditional-permit exemption. The factual situation as developed by the testimony of Breitigan, a witness for the state, was sufficient to raise the factual issue on agricultural use. It was also clear that no conditional permit had been issued by the board. The existence of a conditional-use permit was negatived by the testimony of the chairman of the board of zoning appeals. We find no merit to this assignment of errors.

Assignment of error No. 5 is essentially an argument that the zoning ordinances are unconstitutional in that the zoning board is given plenary authority over conditional permits for mobile homes in A-1 districts, but no guide lines or criteria are established for this determination. However, in this case no appplication was ever made to the board or decision made by it. Hence the question of guide lines is immaterial to the case before this court.

*Judgment affirmed.*

Cole, P. J., and Guernsey, J., concur.

Younger, J., dissenting in part. I concur with the majority decision insofar as it relates to the time for filing a bill of exceptions in a criminal case appealed from the Municipal Court, but I dissent from the affirmance of the conviction herein.

The facts in this case show that Breitigan and Schumacher were friends, each living near the other in house-

trailers. Breitigan made arrangements with the defendant to move his housetrailer on the defendant's farm and went back to him in about a week and arranged to move Schumacher's housetrailer on the farm also. Both trailers were moved on the farm the same day. Breitigan describes Schumacher as follows:

"I met Mr. Schumacher and we lived together in a trailer and he was kind of sickly, and we just was good friends and kind of looked after him and helped him out and kept oil to him and seen his stoves worked all right and we just would sit out the table in the summertime and talk, and when he got ready to move, why he didn't want to stay there and that is when I made arrangements. I talked to Mr. Huffman about moving him out to the farm with me."

He further testified:

"My wife cooks for him; she washes his clothes; she cleans up his trailer for him."

The defendant testified that Breitigan came back to him and discussed the second trailer and Mr. Schumacher and that he acquiesed in his request that both trailers be located on his farm. So that the final arrangement was that both trailers and both men were to move on the farm and that Breitigan was to work on the farm in lieu of rent for both trailers. This was a perfectly logical arrangement and was mutually beneficial. Breitigan worked during the day at his regular job, Schumacher was there with Mrs. Breitigan all the time. The record shows that the residence on the farm burned down and that no one was living there to guard against possible thievery or vandalism.

The majority opinion says "The sole nexus to agricultural use was the promise by Breitigan to work occasionally on the farm, a part-time activity and a relatively minor one from the description of what he actually did." Whether the work done was commensurate with reasonable rent is none of our concern. As long as the parties themselves were satisfied with the arrangement, it was a deal. Whether the members of this court, or the trial court, approve of the deal is of no importance.

It is my opinion that as long as Breitigan worked on the farm, under arrangement with the owner of the land, the presence of these two structures on the land was an "incident to the use for agricultural purposes of the land on which such * * * structures are located" and that no zoning certificate was necessary. The quotation last used is directly from Section 519.21, Revised Code, which prohibits any board of township trustees from zoning such structures. It is also the exact language of the zoning ordinance. It must be borne in mind that the statute does not say that such structures must be used for agricultural purposes. It says that such structures as are "incident" to the use for agricultural purposes are exempt. "Incident" means "associated with or actually related or attaching." It also means "dependent on or appertaining to another thing; directly and immediately relating to or involved in something else though not an essential part of it." (Webster's Third New International Dictionary.)

These housetrailers are more than mere residences, more than a place to live and sleep. They provide the means by which Mr. Breitigen is near his work, where he can do his work after dinner in the evening or in the morning before going to his regular job. They provide the means by which the premises are occupied twenty-four hours a day and are essential in guarding against prowlers or thieves or vandals. Whether this is a "usual arrangement" or whether "there are many farms where such an arrangement does not obtain" or whether there is "evidence as to the customs and use of a particular community," as stated in the majority opinion, is of no concern here. We are faced with certain specific structures under a certain and definite agreement. The agreement itself makes these structures incidental to agricultural uses on this particular farm. In short, their presence is incident to the use for agricultural purposes of the land and exempt by statute and the ordinance, and the defendant can not be found guilty of the charge herein.

Under the admitted facts, I would reverse.